HUGHES, PLAINTIFF IN ERROR, vs. McALISTER & CO., DEFENDANTS IN ERROR.

1. One having a right to property must act with that degree of caution, in making known his claim, as will prevent others, in ignorance of such right, from innocently making advances upon the faith of it. If, by his negligence, men, acting with ordinary prudence, have, in good faith, obtained a right to the property, he cannot complain, if he should be postponed to them.

2. When one has a claim to promissory notes, payable to another, whose claim is evidenced by possession alone, he cannot, with safety, part with that possession, without attaching to the instruments, in some way, notice of his rights. If he does, he cannot deem it a hardship, if his claim is postponed, in favor of a subsequent bona fide assignee.

ERROR ot St. Louis Court of Common Pleas.

STATEMENT OF THE CASE.

Ball brought an action in the court of common pleas against Barlow and others, recovered judgment, and the amount being made on an execution by the sheriff, was brought into court. Various claimants appeared to the fund. The attorneys of the plaintiff claimed the amount of their fees. This claim was disposed of satisfactorily to all parties, and need not further to be noticed. The other claimants were McAlister and O'Flaherty, who insisted on their right to all the money.

James M. Hughes claimed $1200, and interest from the 2d of April, 1850: Heiskell, Dudley & Co. claimed $453 98, and interest from 2d of April, 1850: and Samuel T. Marshall claimed the balance of the money after paying Hughes, Heiskell & Co.

As appears from the foregoing statement of the claims, the real controversy was and is between McAlister & O'Flaherty, on the one side, and the three last mentioned claimants on the other.

It was agreed that the conflicting claims of McAlister & Co, Heiskell, Dudley & Co,

Hughes, and Samuel T. Marshall should all be submitted at the same time to the court, sitting as a jury. McAlister & Co. claimed the money on the ground that the note, on which judgment was obtained, belonged to them, and that the first was in the name of Ball for their use.

Hughes claimed $1200, on an alleged assignment of part of the judgment to him to procure that sum advanced by him to Ball. This assignment was made to him in 1850.

Heiskell, Dudley & Co. claimed that there was an assignment to them of so much of the Judgment as would cover $453 98, and interest, made October 9, 1850; and Marshall claimed to have an assignment of the remainder of the judgment under the same date.

At the trial before the St. Louis court of common pleas, McAlister & Co. introduced as a witness, James C. Way, teller of the bank of the State of Missouri, who testified that the notes on which the judgment was obtained were deposited in bank by McAlister & Co. and carried to their credit; that the smaller one was discounted, and the proceeds paid to McAlister & Co.; that after protest of the notes, McAlister & Co. paid to the bank the amount of the discounted note, and then withdrew both notes from bank.

They also introduced Jno. G. Stevenson, who testified that he was a clerk of the bank, and recognized these notes as the same which had been in possession of McAlister & Co. before they were due, as testified by Mr. Way.

McAlister & Co. then introduced Jno. B. Carson, who testified that he knew Spencer Ball; and that the firm of which he was a member, did, as agents, in the spring of 1850, sell to Ball the steamboat Monongahela. The terms of sale were, one half cash and the balance in notes at 6 and 12 months. The cash payment was made by a check of McAlister & Co. on the bank of Missouri. The notes were, one for $1500, payable in 6 months, and one for $1590, payable in 12 months. Both of these were endorsed by McAlister & Co. McAlister here produced the notes, and witness identified them. The interest on one of the notes was paid by Ball in money at the time.

Joseph Tabor, witness for McAlister & Co., testified that on the 2nd April, 1850, he went with Barlow, Donler and Worthington, to the office of Mr. Crockett to purchase the steamboat Mary Blane. Capt. Ball and Capt. O'Flaherty (on the part of McAlister & Co.,) were present. The price agreed on was $5540, of which, witness paid in cash $2000, and for the remainder, the notes on which judgment had been obtained in this cause, were given. The notes were drawn, payable to the order of witness. O'Flaherty, looking at them, said that witness' name must be the first on their back. The money and note were laid on the table, and were taken up by O'Flaherty. Shortly before the maturity of the notes, McAlister handed to witness and to Ball a notice that the notes were about to fall due. Witness learned from Ball that McAlister had advanced money on the notes; namely, $3000 for the purchase of the Monongahela, after the notes were protested. Ball spoke to witness of McAlister & Co.'s suffering by it, and said, that they having made advances on them, he wished them met on their own account. That a proposal was made, by either McAlister or Ball (witness could not say which,) that the makers and endorsers of the notes, should pay the smaller of them and renew the larger for six months, provided security were given. Witness understood that Ball wished to collect the money to pay his debts. Witness thought that Ball had power to control the notes at that time. This was after the protest; that Ball and McAlister & Co were acting together, as mutually interested in the notes, and that Ball was acting for both.

Mr. Crockett for McAlister & Co. stated that Ball and O'Flaherty came to his office when directions to sue on the note were given, and that O'Flaherty handed the notes to him. After conversation, it was agreed by both, that suit should be brought; and both agreed that the suit should be brought in the name of Ball. Nothing was said, as to whose use the suit was brought. I learned, from what passed, that Ball was indebted to McAlister & Co. in some way, and that he had endorsed and delivered to them these notes, either as colateral or to meet balances, but which of these, witness did not understand. Ball expected or intended the proceeds of the notes or a part of the proceeds, when collected, to go to McAlister & Co., to meet their advances to him, but the state of the accounts between them, witness was not acquainted with.

On cross-examination, Mr. Crockett said he was attorney for Ball, but understood that the pro-

ceeds of the notes, or parts of them, were to go to McAlister & Co. Seeing that McAlister &. Co., were the last endorsers, witness enquired whose name the suit was to be brought in, and was told to sue in Ball's name. There was very little said about it. Witness does not know that he was instructed to bring the suit to the use of McAlister & Co. Sometime afterwards, when the assignments of Hughes and Heiskell and Dudley were shown him, witness had the impression, but cannot say whence it was derived, that McAlister & Co. and Ball, had settled their accounts. Witness supposed that Ball, in making the assignments, was acting with the consent of McAlister & Co. Witness told Heiskell that there had been no prior assignment of the claim; by which, witness meant there had been none since the bringing of the suit. When suit was brought, witness supposed that the notes belonged to Ball, and McAlister & Co. were to be paid out of their proceeds. Witness understood that McAlister & Co. were agents for Ball, receiving deposits from him and making advances for him, and that when suit was brought, Ball was in their debt.

On re-examination, witness stated that he handed the notes to Mr. Marshall (his partner) and told him to bring suit, in the name of Ball.

Geo. Marshall testified, that after the interview of Ball and O'Flaherty with Mr. Crockett, the latter came into witness' room and told him to sue on the notes in the name of Ball. Ball told witness to erase the names of McAlister & Co. Witness afterwards conversed with Ball, in the absence of O'Flaherty.

McMegan testified that the account exhibited, correctly showed the money relations between Ball and McAlister & Co. Witness was book-keeper for McAlister & Co.; that McAlister & Co. as endorsers, paid the two notes given for the deferred payments on the Monongahela, as well as the cash payment. Ball paid them, on the 2nd of April, 1850, $2000; witness heared him say that this money came from the sale of the steamboat Mary Blane, at the same time he deposited the notes on which this judgment was obtained. The notes and cash were received and he was credited with them. At the date of the sale of the Mary Blane she owed McAlister & Co. $1050. This sum was, by agreement with Ball, charged against him, and the boat was released. The account gave Ball credit for the notes in question and other money, and charged him with divers payments made on his account by McAlister & Co., and showed him still indebted to them in the sum of $1844 02.

On cross-examination, witness stated the sources and means of his knowledge of the correctness of the account, and stated that when McAlister & Co. endorsed said notes for the purchase of the Monongahela, they charged him therewith in the accout. Had he paid the notes he would have been credited with their amount.

On the part of Hughes, Heiskell & Dudley, and Saml. T. Marshall, the following evidence was given, viz: The assignments to them, executed by Ball as before mentioned, were read, and evidence was given of the indebtedness of said Ball to Hughes.

The counsel of Hughes, Heiskell, Dudley & Co., and Marshall, then offered as a witness Spencer Ball himself, to whose admission to testify, the counsel for McAlister & Co. objected, at the time, on the ground of incompetency, but the court overruled the objection. Ball stated that before the 2nd of April, 1850, he had a running account with McAlister & Co. On that day he dis· posed of the Mary Blane and requested O'Flaherty to go with him to Mr. Crockett's office, he, (Ball,) being unacquainted with the purchasers. That O'Flaherty asked him if he had any use for the money, to which Ball replied he had not and that McAlister & Co. might have the use of the money and notes until he wanted them. That after crediting Ball with the cash payment of $2000, McAlister & Co. fell in his debt about $500. That he lent the notes, then taken, to McAlister & Co. After suit was brought Ball went to Mr. Wells to try to trade off the notes. McAlister & Co. were well advised of this. Witness told them that he could not stand it till fall, unless he got the notes discounted; to which they replied, that in that case, their names must be taken off the notes first. Witness told them that he had told Mr. Marshall to do this when suit was first brought. When the parties were in the office of Mr. Crockett, on his asking in whose name suit was to be brought, O'Flaherty said "in Capt. Ball's name of course." Witness cannot state whether or not McAlister & Co. knew of his negotiations with Hughes and Heiskell &

Co. Witness said there was an error of $50 00 or more, in the account stated between him and McAlister & Co. and referred to by Megan. McAlister & Co. were accommodation endorsers for Ball on the time notes for the Monongahela. There was no special contract.

On cross-examination witness said he did not know how his account with McAlister & Co. stood when the notes sued on fell due. They (McAlister & Co.) had advanced $3000 cash on the purchase of the Monongahela, and endorsed and paid the time notes. Witness denied that he said to Mr. Tabor that McAlister & Co. were suffering by the non payment of the notes sued on, and in explanation said, that he did tell Mr. Tabor that they were suffering by reason of the nonpayment of the note which had been discounted, and which was the smaller one: the money for which witness said to Tabor he would feel bound to raise for McAlister & Co. Witness did take up that note, or pay the money to take it up. This he did because they growled about it so much. That was only part of what witness then owed them. Witness then said he had no interest in the event of the suit, and he claimed no interest in the judgment since his assignment to Heiskell, Dudley & Co.

On re-examination he said that the debt stated to be due to Hughes, Heiskell, Dudley & Co. and Marshall were all bona fide actual debts. That the money owing to Marshall (who was witness' nephew) was for borrowed money and land sold in Kentucky; that witness and Marshall lived in Clarksville, Missouri, and that the steamboat Monongahela was in debt to McAlister & Co., which debt is still due. It is not mentioned in the account of witness with McAlister & Co.

Capt. Allen for the same parties testified that he was present at the sale of the Mary Blane to Tabor and others at Crockett's office. That O'Flaherty went there to release the vessel from a lien he had on her, and to get counter security for himself, he being on a forthcoming bond for the delivery of the Mary Blane, according to a decree of court. After the sale was made, O'Flaherty asked Ball if he wanted the use of the money and notes, and Ball told him he might have them for the present, and that he, Ball, might want them in 30 days or might not want them for six months, and thereupon O'Flaherty took the money and notes. This was all the evidence in the cause.

Appellants asked the following instructions, which the court gave:

1. That if the court find from the evidence in the cause, that the notes in question were placed in the hands of McAlister & Co. to be returned to Ball, when he desired it, that while this agreement lasted, no lien could attach upon them for any advance by McAlister & Co.

3. That in the absence of other poof, the bringing of the suits in the name of Ball, with the consent of McAlister & Co. is conclusive evidence of Ball's right to the notes.

4. That if it appears from the evidence in the cause, that prior to the alleged assignment to the plaintiffs, in the several motions here, Ball demanded the notes of McAlister & Co. for the purpose of negotiating them in his own name, and McAlister & Co. consented to his so doing, provided their names were taken off and this fact was communicated to the said Heiskell, Dudley & Co., Hughes, or Marshall or any one of them, then any one of said assignees, who acted on the faith of such communication, ought to be sustained in his assignment, if made in good faith.

The appellants asked the following instructions, which were refused, appellants excepting:

2. That if the notes were placed in the hands of McAlister & Co., to be returned to him when he wanted them, that in such case Ball retained the power to transfer the notes, and if they were transferred to Hughes, Heiskell, Dudley & Co. and Marshall, or either of them for a valuable consideration, the same was valid.

5. That if the said notes were not entered to the credit of Ball by McAlister & Co. till after the failure of Ball in the absence of other proof, the presumption is they were transferred to McAlister & Co.

And of its own motion the court gave the following declaration of law, viz:

That if the notes in question were handed to the attorneys in this suit by Mr. O'Flaherty, of the firm of McAlister & Co., and were, at the time, endorsed in blank by said Ball, and by said McAlister & Co., the presumption would be, in the absence of other proof, that they were the property of McAlister & Co. That if said O'Flaherty and said Ball directed or assented that suit should be brought in the name of said Ball, and that the said McAlister & Co.

Hughes vs. McAlister & Co.

should be paid out of the proceeds thereof, any balance due from Ball to them, then McAlister & Co. are entitled to the amount of such balance. If the notes were loaned to McAlister & Co. on the 2d of April 1850, and were then endorsed and delivered to them by said Ball, with the understanding that McAlister & Co. might have the same discounted in Bank or otherwise use them for their own accommodation, to be returned when wanted by said Ball, and that said McAlister & Co. afterwards, on the 30th April, advanced for said Ball, at his request, $3000, and became accommodation endorsers for said Ball on two notes for $1500 each, and that there was an open account between said parties, and said Ball had been in the habit of depositing his funds with McAlister & Co. and of drawing the same from them when a balance in his favor was in their hands, then the said McAlister & Co. had a right to retain said notes or the proceeds thereof, until said balance was paid, and they were indemnified against their endorsements for the accommodation of said Ball.

That by placing said notes in the hands of the attorneys, for collection, with the understanding stated in instruction number six, said McAlister & Co. did not relinquish their claim to said notes or the proceeds thereof To all of which the appellants excepted.

The court then ordered $150 to be paid to Crockett & Marshall and the rest of the money to McAlister & Co. Appellants filed a motion for new trials, &c., in uue course, and excepted to the overruling thereof by the court, and appealed.

### GLOVER & CAMPBELL, for appellants:

The court of common pleas misconceived the propositions of law involved in the controversy.

The court appears to have considered that there were no parties interested in the case except Ball and McAlister & Co , and the principles of law were ruled accordingly.

This will be seen by examining the instructions given by the court at his own instance. That instruction declares the law to be, that if the notes in question were handed to the attorneys in the suit by Mr. O'Flaherty of the firm of McAlister & Co., and were at the time endorsed in blank by said Ball and by said McAlister & Co., the presumption would be, in the absence of other proof, that they were the property of McAlister & Co. This, as an abstract proposition, certainly cannot be controverted, and if this was the whole case. the conclusion of the court would be very proper. But it is not the case before the court. The evidence showed that McAlister & Co. consented to erase their names and to the suppression or concealment of their interest in the notes, so far as third persons are concerned. They had so much confidence in Ball, were so unwilling to incur costs on their own account as to put the suit in Ball's name, and place him before the community as the owner of the notes. They assented to the bringing the suit in Ball's name, and one of them signed the attachment bond in the case in which Ball had, with their knowledge made an affidavit that he was the owner of the notes, and the money due to him. They knew that Ball was endeavoring to sell the notes after the suit was brought, and that he had offered them at a heavy discount. They had so far acquiesced in his selling them, as to require in that event, that their names should be erased, and they were reminded that that was done when the suit was brought. At this time Ball was commanding the Monongahela, and scarcely suspected of insolvency. It is under this state of the case that the notes are transferred to the plaintiff in error.

We conceive that these facts deserved the attention of the court, and materially affected the legal principles on which it was to be decided. The objection to the Judge's ruling is, that he appears to have deemed them immaterial. Let us proceed to show this. The instruction continues thus: "That if said O'Flaherty and said Ball directed or assented that suit should be brought on said notes, in the name of Ball, and that said McAlister & Co. should be paid out of the proceeds thereof, any balance due from said Ball to them, the said McAlister & Co. are entitled to the amount of said balance." That is, if the agreement mentioned by the court was made, then, notwithstanding any other matters of fact in the case, McAlister & Co.

Hughes vs. McAlister & Co.

are entitled to the amount of said balance. The fact that said McAlister & Co. may have been willing to trust Ball to sell the notes in the market, they looking to him only for their rights, may have authorized him to do so, on the single condition of erasing their names, are all deemed immaterial in the law for the decision of the case.

The instruction proceeds—"If the notes were loaned to McAlister & Co. by Ball, April 2d, 1850, and then endorsed and delivered to them by said Ball, with the understanding that said McAlister & Co. might have the same discounted in bank, or otherwise use them for their own accommodation, to be returned to him when wanted, by said Ball, and said McAlister & Co. afterwards, April 30th, advanced for said Ball at his request, $3000 in cash, and became accommodation endorsers for Ball, on two notes for $1500 each, and there was an open account between said parties, and said Ball had been in the habit of depositing his funds with said McAlister & Co. and drawing the same from them, when a balance in his favor was in their hands, then the said McAlister & Co. had a right to retain said notes or the proceeds thereof, until such balance was paid, and they were indemnified against their endorsement for the accommodation of said Ball. '

Here again the prevailing idea was, that there was no principle of law to be ruled in the case save what concerned the rights of McAlister & Co. and Ball, as between themselves, and no part of the evidence connected with the purchase of the plaintiffs or the conduct of McAlister & Co. was material to the adjudication of the cause as between the said plaintiffs and McAlister & Co.

But this is yet more manifest from the next paragraph in the instruction: "That by placing the notes in the hands of the attorneys for collection, with the understanding stated in the instruction number six (the one given by the court on his own motion) said McAlister & Co. did not relinquish their claim to the notes or the proceeds thereof." We do not question that as between themselves and Ball, they relinquished nothing of their rights by ordering suit to be brought in Ball's name: nor would they have relinquished, as between themselves and Ball their claims upon the notes, by merely giving him a legally authenticated power of attorney to sell the notes for them to a third person. But all this is a misdirected view of the merits of the controversy. The question was between the plaintiffs and McAlister & Co., not Ball and them. And the propositions of law, laid down by the court, as governing the case, were not the true ones applicable to it.

The court declared the law to be, that the bringing the suit in Ball's name, in the absence of other proof, was conclusive evidence of his title to the notes, (see third instruction given for the plaintiffs in error.) This was the evidence before the plaintiffs in error, when they purchased the notes of Ball. This evidence of Ball's title was placed before them by the act of McAlister & Co. They were also informed by Mr. Crockett of the fact, and that there had been no transfer afterwards. There was no proof that plaintiffs had any cause to suspect the notes were not as represented by the suit.

Following the principle of this instruction, the court ought to have ordered the money to be paid to the plaintiffs. But instead of this, the court proceeds to instruct, that if McAlister & Co. assented to the bringing suit in Ball's name, and Ball agreed to pay them out of the proceeds; &c., they are entitled, &c., notwithstanding their own acts had directly misled and deceived the plaintiffs. The principle laid down in the fourth instruction given for the plaintiffs, was also disregarded in adjuging the case.

The principle of law, applicable to the case, which the court has disregarded in the instructions given and excepted to by plaintiffs in error is, that where one person, by his own act, holds forth another as the owner of property, until that other has inveigled a third person to deal with him in regard to it, by means of the acts of the first party, he shall not be allowed to object to the consequences of his own conduct.

If McAlister & Co. had not placed it in the power of Ball to transfer the notes to the plaintiffs, under the circumstances named, it would not have been done.

Hughes vs. McAlister & Co.

FIELD, for defendants in error.

· I. McAlister & Co. had a lien on the fund in controversy, to the amount of their balance of account with Ball. This right appears in the case, to rest upon these grounds, either one of which is sufficient to support it.

1. As Bankers,

McAlister & Co. acted as the bankers of Ball, receiving his money on deposit and paying it out from time to time on his checks. As to lien of bankers, see Story's Agency, sec. 373, et seq., sec. 380.

2. As Agents and Commission Merchants.

Story's Agency, sec. 351 et seq., and *particularly* sec 373; Bank vs. Devy, 1 McMullan's Reps., 431.

3. By Contract.

The contract of pledge is implied from the circumstances: Story on Bailments, sec. 300.

II. The lien thus acquired by McAlister & Co. was not, in fact, waived by them.

1. Not by the suit in Ball's name, for that was a form adopted for convenience, allowing McAlister to become surety in the attachment bond. As to waive of a pledge, see Story on Bail., secs. 299, 368, et seq.

2. The testimony of Ball, to prove an express waiver, was obviously not believed by the court below, and properly; for he was strongly biassed in favor of other claimants, and besides, his conduct, on his own showing, was marked with bad faith, in this, that under pretence of raising money, he assigned the judgment to a relative, to pay an old debt of many years standing.

SCOTT, J., delivered the opinion of the court.

We are satisfied from the evidence preserved in the record, that McAlister & Co. had an equitable right to the proceeds of the judgment which are now in controversy. That right existed prior to the assignment made to Hughes, and must be enforced, unless McAlister & Co. themselves, or by their attorney, have manifested such negligence and inattention to the interests of others, as will induce a court to postpone their priority to the rights of those subsequently acquired. One having a right to property, like that now the subject of dispute, must act with that degree of caution, in making known his claim, as will prevent others, in ignorance of their rights, from innocently making advances upon the faith of it. If by his negligence, men, acting with ordinary prudence, have, in good faith, obtained a right to the property, he cannot complain if he should be postponed to them. McAlister & Co. had in their possession, the notes on which the judgment was obtained; they might have sued on them in their own names; they suffered them to pass out of their hands, their names as the last endorsers to be erased; suit to be brought in the name of Ball; they become sureties in the attachment bond, in which it is recited, that the suit was about to be brought in the name of Ball, without any intimation that it was for their benefit. The attorney, who brought the suit, is so informed as to their rights,

that he told one of the parties, that there had been no assignment since the suit was brought; that he thought, at the institution of the suit, the notes were Ball's, and under these impressions, actually drew the assignments which have given rise to this controversy. This chain of circumstances shows such a degree of negligence, on the part of McAlister & Co., as must postpone their claims to those of the innocent assignees who have advanced their money to Ball on the faith of this paper. That Ball has acted faithlessly towards McAlister & Co. cannot avail them. Others should not be visited with the consequences of their misplaced confidence. When one has a claim to promissory notes, payable to another, whose claim is evidenced by possession alone, he cannot, with safety part with that possession, without attaching to the instruments, in some way, notice of his rights. If he does, he cannot deem it a hardship if his claim is postponed to a subsequent *bona fide* assignee. The course of the assignees is marked with that degree of caution which characterizes the conduct of prudent men in the transaction of business. Seeing the suit on the notes in the name of Ball, they are unwilling to deal with him on the faith of that circumstance alone, but go to the attorney who instituted the suit, and from him obtained such imformation as satisfies them of Ball's right to the notes; they then close the bargain, and have the assignments drawn by the very attorney himself, who brought the suit. The other judges concurring, the judgment will be reversed, and the money in the hands of the sheriff, will be distributed among the assignees, according to their rights as appears from the record, and in the order specified in the assignment to Heiskell & Co.